FILED

10/30/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2020 Session

## IN RE ROMMIE H.

**Appeal from the Chancery Court for Sumner County**
**No. 2018-AD-25     Louis W. Oliver, Chancellor**

_____

**No. M2019-01359-COA-R3-PT**

_____

A mother appeals the termination of her parental rights to her child. The trial court concluded that the paternal grandparents had proven three statutory grounds for terminating the mother's parental rights: abandonment by failure to visit; abandonment by failure to support; and failure to manifest an ability and willingness to assume custody of her child. The court also concluded that termination of the mother's parental rights was in the child's best interest. On appeal, the mother argues that the grandparents' petition did not sufficiently plead the statutory grounds for termination. And even if sufficiently pled, the mother argues that the evidence of the grounds and the child's best interest was less than clear and convincing. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

William Shea Forgety, Hendersonville, Tennessee, for the appellant, Jody H.

Patti B. Garner and Hannah N. Garrett, Hendersonville, Tennessee, for the appellees, Penney R. and John R.

Erin A. Stubbs, Gallatin, Tennessee, Guardian Ad Litem.

# OPINION

## I.

### A.

Jody H. ("Mother") is the biological mother of three children, Hayden, Caleb, and Rommie. Mother voluntarily surrendered her parental rights to Caleb when he was born.[1] But she contends the trial court erred in terminating her parental rights to Rommie.

In 2016, Mother lived with Hayden, Rommie, and John H. ("Father") in a two-bedroom mobile home. As a couple, Mother and Father struggled financially. Father's parents were often asked to help pay their bills. Mother blamed Father for their financial woes, citing his inability to keep a job. In August, however, Mother quit her job, leaving Father as the sole breadwinner for the family.

Hayden, Mother's child from a previous relationship, was nine years old. He had been diagnosed with autism at an early age. In September 2016, he revealed that Mother wrapped duct tape around his mouth and hands to keep him quiet. He complained that removing the tape "hurt his hair." His allegations prompted the Tennessee Department of Children's Services ("DCS") to open an abuse investigation.

A couple of weeks later, law enforcement reported two toddlers had been discovered in a residential neighborhood without supervision. The toddlers appeared to be approximately one and three years old. One was dressed only in a diaper. They were both dirty, but unharmed. A DCS investigator, along with law enforcement, canvassed the neighborhood for information. Approximately two hours after the children were found, Mother emerged from her home. She identified the toddlers as her niece's children whom she had been babysitting. She surmised that they had wandered off while she was sleeping. Mother seemed unconcerned that the toddlers were alone outside for several hours. According to Mother, this was not the first time they had escaped.

The DCS investigator noted that Mother's home environment was inappropriate for the children. The electricity had been disconnected for nonpayment. The home had "a strong odor of urine." The children's beds were wet. Clothes, toys, and dirty diapers littered the floor. The investigator also realized that Mother was the alleged perpetrator in an open abuse investigation. When questioned about the abuse allegations, Mother explained that "she was just playing" and "she had only done it a few times before."

Mother was immediately arrested on child neglect charges. Hayden and Rommie, who was just fourteen months old, were initially placed with their maternal grandmother.

---

[1] Mother testified that friends adopted Caleb after his birth in exchange for $500.

2

About a month later, the maternal grandmother indicated she was no longer willing to care for the children. With Mother's consent, the juvenile court awarded temporary custody of Rommie to her paternal grandparents, Penney R. and John R. Hayden was placed separately with his paternal grandparents.

The juvenile court adjudicated both children dependent and neglected. And on April 27, 2017, the court transferred custody of the children to their respective paternal grandparents and allowed DCS to terminate services. The court determined it was in the children's best interest to transfer custody since Mother remained incarcerated with unresolved legal issues. The court specified that Mother could seek a return of custody "when . . . ready."

Mother later pled guilty to felony child abuse and neglect for her treatment of her oldest child. She was released on August 9, 2017, having served 10 months of a three-year sentence. She remained on supervised probation for the next two years.

While incarcerated, Mother ended her relationship with Father. After her release, she was hired as a full-time employee at a construction company. From October 2017 through the time of trial, she worked approximately forty hours per week, earning between $10 and $11 an hour. With her consistent earnings, Mother's financial situation improved to the point that she was able to purchase a car.

But Mother never filed a petition to regain custody of Rommie. And she waited five weeks after her release to contact the paternal grandparents about visiting her child, who was then over two years old. The paternal grandparents arranged an initial visit at a time and place convenient for Mother. Still, Mother was late. Two weeks later, Mother called again. A second visit was arranged near Mother. And again, she was late. Both visits were short, only about an hour.

Another month went by with no contact from Mother. When Mother resurfaced, the paternal grandparents agreed to meet Mother and her family for dinner at a local restaurant. The paternal grandparents later explained that the change in visitation was Mother's idea. She wanted to have dinner instead of playing at a playground. As usual, Mother was late. At Mother's request, the paternal grandparents also brought the child to a holiday party hosted by Mother's family that same month.

Mother visited her child four times in 2018—in January, April, June, and July. The first three visits were each about an hour or two at a local restaurant. In July, she attended the child's third birthday party at the paternal grandparents' home. And, for the first time, she brought gifts—clothes, a toy, and a $20 gift card.

Mother's gross earnings in 2018 were over $25,000. Her estimated living expenses ranged between $500 and $1000 a month. In the spring of 2018, Mother met

Roy G. through an online dating service. Two weeks later, the couple moved in together. After Roy G. moved in, he paid half of Mother's living expenses. Mother agreed that, in combination, the couple had approximately $30,000 in disposable income in 2018. But other than the July 2018 birthday gifts, Mother never contributed toward her child's support.

B.

On July 31, 2018, the paternal grandparents filed a petition to adopt Rommie and to terminate Mother's and Father's parental rights. The petition alleged multiple grounds for termination against each parent. Father consented to termination of his parental rights before trial. But Mother opposed termination of her rights.

The day before trial, April 10, 2019, Mother filed a motion to dismiss. She contended that the paternal grandparents had failed to plead any grounds for termination of her parental rights. After reviewing the petition and considering the arguments of counsel, the court denied the motion to dismiss.

At trial, Mother conceded that using duct tape on her son was "the biggest mistake of [her] life." The incident caused her to "los[e] both of [her] kids" and "destroyed [her] future." But this was not an isolated incident. Proof at trial revealed other examples of Mother's poor parenting skills. Hayden had nearly drowned at age two while he was with Mother and Father in a backyard pool. Mother did not notice he was in danger until the maternal grandmother brought it to her attention. Similarly, Mother failed to notice that her niece's children had wandered away from her home for almost three hours. While Rommie was in Mother's care, she twice contracted pinworms from playing in the cat's litter box. Mother also admitted she and Father had used illegal drugs in the children's presence.

The paternal grandparents also highlighted Mother's limited involvement in her child's life. She never asked the paternal grandparents about her child's health, education, or well-being. And she waited five weeks after her release to call to schedule a visit. After that, she called, at best, once a month or so. And she never came to a visit alone. She always brought the maternal grandmother, and later, Roy G. During the four months before the petition was filed, Mother and the child spent approximately six and one-half hours together, and none of it one-on-one. Mother made no effort to maintain contact between visits. She never talked to her child on the telephone or followed up on the paternal grandmother's suggestion that she try to video chat.

For her part, Mother emphasized her improved financial situation. She had been consistently employed since her release. She had no contact with Father. She had complied with all of her probation requirements. She had not used illegal drugs since March 2018. And her current home was clean and pet-free.

4

Mother brushed off the episodes from her past, mostly claiming that she was not at fault. The near drowning incident was an accident. DCS investigated but took no action against her. She tried to take care of the pinworm issue by treating the cat and cleaning out the litter box. And she blamed Father for the toddlers' escape, the lack of electricity, and bringing drugs and inappropriate people into the home.

Still, Mother knew that DCS had recommended she complete certain tasks to regain custody. She acknowledged that DCS had created a family plan after her arrest. Although she completed the recommended parenting assessment, she never took parenting classes, obtained homemaker services, or took any other steps to improve her parenting skills.

Mother was also aware of her obligation to support her child. According to Mother, she never paid any support because the paternal grandparents never asked and she had her own bills to pay. As for her infrequent visits with her child, she complained that the paternal grandparents were in control. She would have visited more if she had been allowed. But she agreed that the paternal grandparents never interfered with her visitation. They responded to her visit requests and tried to accommodate her schedule.

The trial court concluded that the paternal grandparents had shown, by clear and convincing evidence, three grounds for termination of Mother's parental rights—abandonment by failure to support, abandonment by failure to visit, and failure to manifest an ability and willingness to assume physical custody or financial responsibility for the child. The court further concluded that the evidence was clear and convincing that termination of Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. State statute identifies those circumstances in which the government's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for

5

termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

We first address Mother's argument that the petition did not provide adequate notice of the alleged grounds for termination of her parental rights. Parental rights can only be terminated on grounds that were alleged in the termination petition. *See In re M.J.B.*, 140 S.W.3d 643, 655-56 (Tenn. Ct. App. 2004). Notice is "a fundamental component of due process." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *13 (Tenn. Ct. App. Apr. 29, 2005); *see also Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002) ("Basic due process requires 'notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (citation omitted)). Pleadings should give the opposing party enough notice of the issues to prepare a defense. *Keisling*, 92 S.W.3d at 377. In the context of parental termination, due process requires that the parent be notified of the alleged grounds for termination. *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *8 (Tenn. Ct. App. May 2, 2017).

We conclude that the petition adequately apprised Mother that the paternal grandparents were pursuing abandonment by failure to support and failure to visit as grounds for termination of Mother's parental rights. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2018). In relevant part, the petition alleged

> 24. Pursuant to T.C.A. § 37-1-113, the Mother has abandoned the child by her willful failure to support the child for four (4) months immediately preceding the filing of this petition or the support paid in the four months immediately preceding the filing of this petition was token support. Mother has not contributed to the support of the child since October, 2016. Mother is able bodied and capable of working and supporting the child and she has made no attempt to support the child and has provided no justifiable excuse for failing to support the child.
>
> . . . .
>
> 26. The Mother has abandoned the child in that she has failed to seek reasonable visitation with the child for four (4) months immediately preceding the filling of this petition and has failed to visit or the visits in the four (4) months immediately preceding the filing of this petition were token visits merely to maintain minimal contact, as defined in T.C.A. § 36-1-102.

Mother complains that the statutory grounds for termination are listed in Tennessee Code Annotated § 36-1-113(g), not "T.C.A. § 37-1-113" or "T.C.A. § 36-1-102." That may be true, but these citations did not deprive Mother of adequate notice. *See* Tenn. R. Civ. P. 8.05(1) (allowing the pleader to "either specifically refer to the statute or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged"). The petition alleged that Mother abandoned her child, one of the statutory grounds for termination. *See* Tenn. Code Ann. § 36-1-113(g)(1). And it alleged all of the facts necessary to satisfy the first definition of abandonment. *See id.* § 36-1-102(1)(A)(i).

We reach the same conclusion with respect to the statutory ground in Tennessee Code Annotated § 36-1-113(g)(14). The petition alleged

> 30. The Respondents have failed to manifest an ability and willfulness [sic] to assume legal and physical custody of the child;
>
> 31. Placing custody of the child in the Respondents' legal and physical custody would pose [a] risk of substantial harm to the physical or psychological welfare of the child[.]

7

Mother maintains that these allegations could describe a ground for termination applicable only to putative fathers. *See id.* § 36-1-113(g)(9)(A)(iv). But when the petition was filed, Father was the child's legal parent, not a putative father.[2] *See id.* §§ 36-1-102(29)(A)(iv), (44). And the putative father ground does not include the language in paragraph 31. *See id.* § 36-1-113(g)(9)(A)(iv). Read together, these paragraphs fully describe the ground for termination in Tennessee Code Annotated § 36-1-113(g)(14), which applies to legal parents. *See id.* § 36-1-113(g)(14) ("A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]").

While the petition is not perfect, the allegations were sufficient to put Mother on notice of the grounds at issue. So we turn to whether the paternal grandparents established, by clear and convincing evidence, at least one ground for termination of Mother's parental rights.

B.

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." *Id.* § 36-1-113(g)(1). Abandonment as a ground for the termination is defined in five different ways. *See id.* § 36-1-102(1)(A). The chancery court concluded that Mother abandoned her child under the first definition.

At the time the petition was filed, the definition of abandonment included the failure "to visit or . . . to support or . . . to make reasonable payments toward the support of the child" during the four months immediately preceding the filing of the petition to terminate parental rights. *Id.* § 36-1-102(1)(A)(i).[3] Our focus here is on Mother's conduct between March 31, 2018, and July 30, 2018, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the

---

[2] Mother admitted in her answer that Father executed a voluntary acknowledgement of paternity. *See* Tenn. Code Ann. § 24-7-113(a) (2017).

[3] We find Mother's argument that the petition failed to put her on notice that she bore the burden of proof on lack of willfulness unavailing. The petition notified Mother that abandonment for failure to support and failure to visit were at issue. And the trial court properly applied the definition of abandonment that was in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

last day in the relevant four-month period). The chancery court found that Mother willfully failed to visit and to support her child during the relevant four-month period.

a. Failure to Visit

Mother visited her child three times during the relevant period, in April, June, and July. The trial court found that these visits were merely token. *See* Tenn. Code Ann. § 36-1-102(1)(E) (A parent has failed to visit if the parent "engage[d] in [no] more than token visitation" during the relevant four-month period.). A visit is token if it is "nothing more than perfunctory" or the visits are so infrequent or short "as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). In determining whether Mother's visits were token, evidence of "the parent's conduct and the relationship between the child and the parent" outside of the four-month period provides "relevant background and context." *See In re Keri C.*, 384 S.W.3d 731, 749 (Tenn. Ct. App. 2010).

The evidence does not preponderate against the trial court's finding that Mother's visits were token. The child was only fourteen months old when Mother was arrested. They had no contact at all for almost a year after Mother's arrest. The majority of that time Mother was incarcerated. But even after her release, she waited five weeks before seeking to visit her child. The paternal grandparents questioned whether the child even recognized Mother after such a long separation. Rather than scheduling regular visits, Mother was content with infrequent, short visits at a local restaurant. Even then, Mother was chronically late and never spent one-on-one time with her child. Mother never called her child or tried to arrange a video chat between visits. *See In re Amelia M.*, No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *9 (Tenn. Ct. App. Aug. 30, 2013) ("Telephone calls may be relevant . . . as contact between parent and child."). While Mother gave conflicting testimony on some of these points, the trial court did not credit her testimony. And we will not second guess the court's credibility determination. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.").

Lack of willfulness is an affirmative defense to a claim of abandonment for failure to visit or support. Tenn. Code Ann. § 36-1-102(1)(I). Mother did not meet her burden of proof on this defense.[4] *See id.* Our supreme court has stated that "a parent who attempt[s] to visit and maintain relations with [her] child, but [i]s thwarted by the acts of others and circumstances beyond [her] control, [does] not willfully abandon [her] child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. At trial, Mother complained that the

---

[4] Mother contends that the trial court erred in finding that Mother did not raise the affirmative defense of willfulness in her answer or at trial. The trial court's error, if any, was harmless because Mother did not meet her burden of proof.

9

paternal grandparents controlled when she could visit her child. But she conceded that they never interfered with her efforts to visit. They always responded to her calls and tried to accommodate her schedule.

We conclude that the evidence is clear and convincing that Mother abandoned her child by failure to visit during the four months preceding the filing of the petition. Her three visits were merely token. And she failed to establish that her failure to visit was not willful.

b. Failure to Support

The July 2018 birthday gifts were Mother's only contributions toward the support of her child. The trial court found this support was token. *See* Tenn. Code Ann. § 36-1-102(1)(D). Support is token if it is "insignificant given the parent's means." *Id.* § 36-1-102(B). The evidence does not preponderate against the trial court's finding. Mother had gross earnings of over $25,000 in 2018. Even accounting for her living expenses, she had sufficient disposable income to contribute to her child's support. Maternal grandmother, who was intimately familiar with Mother's finances, testified that Mother could afford to pay at least $30 a week in child support.

The evidence also does not preponderate against the trial court's finding that Mother's failure to support her child was willful. *See id.* § 36-1-102(1)(I). A "[f]ailure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Mother was aware of her duty to support and certainly had sufficient means. Her excuse was that the paternal grandparents "didn't ask, even though I asked them if they needed anything, and just having to pay my own bills." The paternal grandparents denied Mother ever offered any support. And the trial court did not credit Mother's testimony on that point. *See Richards*, 70 S.W.3d at 733-34. The paternal grandparents' failure to ask for help, standing alone, is not a justifiable excuse. A parent's obligation to pay child support exists without a court order, much less a request from the child's custodian. *See State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004).

We also conclude that the evidence in this record is clear and convincing that Mother abandoned her child by failure to make reasonable payments toward the support of the child. The few items she provided were merely token. And she failed to prove a lack of willfulness.

10

2. Failure to Manifest Ability and Willingness to Assume Custody or Financial Responsibility

Finally, the court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

The paternal grandparents established by clear and convincing evidence that Mother failed to manifest both an ability and willingness to personally assume legal and physical custody and financial responsibility for her child.[5] While Mother claimed she was willing to assume custody, she never showed it. She never sought a return of custody after her release from incarceration. She seemed content with short, sporadic visits. She displayed no interest in her child's health, education, or well-being. She did very little to establish a meaningful relationship with her child. She never contributed to her child's support. As for ability, she may have overcome some financial hurdles, but she has yet to take any action to improve her parenting skills.

The evidence is equally clear and convincing that returning the child to Mother's custody would pose a risk of substantial harm to her child's physical or psychological welfare. Mother argued at trial that she was financially secure, had ended her relationship with Father, and no longer had a cat. But these changes, while positive, did not address the core problem—Mother's failure to pay appropriate attention to the children in her care. So we can conclude the child, more likely than not, faced a real

---

[5] This Court has split over the proper interpretation of the first prong of Tennessee Code Annotated § 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11 (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's differing views on the first prong). The split concerns whether a parent must fail to manifest *both* an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest *either* an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Here, under either view, the paternal grandparents met their burden of proof.

hazard or danger of harm if returned to Mother. *See Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

C.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

The trial court found that all nine factors favored termination. Based on this record, we find the evidence preponderates against the trial court's finding on factors seven and eight.

The seventh factor focuses on the parent's home environment. *See* Tenn. Code Ann. § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]"). The trial court found this factor favored termination based on the condition of Mother's home at the time of her arrest and her failure to obtain homemaker services. But the only proof in this record concerning Mother's home environment at the time of trial was that the home was clean and pet-free. And the paternal grandparents submitted no evidence of any criminal activity or current drug use in the home. This factor favors Mother.

12

The eighth factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). There is no proof in this record that Mother has any mental or emotional issues. This factor also weighs against termination.

Still, we reach the same conclusion as the trial court. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the child's best interest. Mother has never addressed her poor parenting skills. She paid no child support, and her contact with her child has been sporadic, at best. The child is thriving in her current environment. She has spent "two-thirds of her young life" in the paternal grandparents' care. They want to adopt her. There is no evidence that the child has a meaningful relationship with Mother. By contrast, the child has developed a strong bond with the paternal grandparents. From the child's perspective, it is evident that a change in caregivers is likely to have a detrimental impact on her emotional and psychological well-being.

## III.

Mother had sufficient notice of the grounds for termination of her parental rights. The record contains clear and convincing evidence to support terminating Mother's parental rights on three statutory grounds. The record also contains clear and convincing evidence that termination is in the child's best interest. So we affirm the termination of Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE